Moncure, P.
There are four assignments of error in this case, three of them made by the counsel of the appellants in the petition of appeal, and one of them by the counsel of the appellee, Holland, in his printed argument. I will first consider those of the appellants.
1st. They assign as error, that a certain debt due to the testator, Samuel P. R. Moorman, at his death, by one Wesley Peters, and collected by the administrator, James F. Johnson, in May and July 1863, was charged to the administrator, in the settlement of his accounts, at the scaled value of so much Confederate currency at the time it was received, instead of being charged to him at its nominal amount in good money.
*101 A personal representative is not warranted in receiving a specie debt due to tbe decedent’s estate in a greatly depreciated currency — depreciated to tbe extent to wbicb • . , , . £ . , , it was depreciated when tbe money was received by tbe representative in tbis case — unless there be something in tbe condition of the debt, or in tbe state of tbe demands of creditors or legatees of tbe estate, or otherwise, which makes it to tbe interest of tbe estate that tbe debt should be so received. In tbis case it is not pretended that the debtor, Wesley Peters, was not perfectly solvent, and likely to continue so, at tbe time bis debt was received by tbe administrator of tbe creditor; nor that the collection of tbe debt was required for tbe purpose of being paid to creditors or legatees of tbe deceased. Tbe money was not, in fact, paid to creditors or legatees after it was received by tbe administrator, but was either used by him for bis own purposes, or remained in bis bands until after tbe war; on wbicb subject there seems to be no evidence in the record. Where, then, was tbe necessity or propriety of receiving it in a depreciated currency — depreciated, it is said, to tbe extent of 8£ to one, as compared with gold? How was tbe estate benefited thereby?
The only way in which it is claimed by the administrator that the estate was benefited by this transaction, is, that a large portion of the debt due by Peters, to wit, $8,860 38 cents, was a simple contract debt barred by the statute of limitations; and payment of it could not, therefore, be coerced; and that the administrator was enabled to collect that part of the debt, and a balance of $1,786 66 cents, only by agreeing to receive, and actually receiving, both amounts, $5,147 04 cents, in Confederate currency.
The appellants’ counsel argue, very strongly, to show that even if a large portion of tbe debt Was, in fact, *102 barred by tbe statute of limitations, and would not have been paid otherwise than in Confederate currency, still there was a balance of the debt remaining due in specie greatly exceeding the scaled value of the whole amount of Confederate currency received from the debtor in payment of the debt; so that, even in that view, the administrator was guilty of a devastavit in making the arrangement which he did.
Without considering and expressing an opinion upon that matter, however, I will proceed to consider other grounds which they take in their argument, viz: 1st, that no portion of the debt due by Peters was, in fact, barred by the statute of limitations; and 2dly, that if the statute were applicable to any portion of the debt, it does not appear that the debtor would have availed himself of the defence of the statute, if the administrator had not been willing to receive payment of the debt in Confederate currency.
The portion of the debt referred to, is the amount due upon three bonds of Wesley Peters and A. C. Rucker to Wm. B. Preston, commissioner, &c., for $858 14 cents each, dated the 27th day of August 1851, payable, one of them on or before the 27th day of February 1852, another on or before the 27th day of August 1852, and the other on or before the 27th day of February 1858. These bonds were due by Wesley Peters; and by an arrangement between him and the testator, S. P. R. Moorman, they were taken up by the latter for the former as they fell due. On each of the bonds is endorsed a receipt, dated about the time of its maturity, for the amount of the bond in full, received of S. P. R. Moorman, and signed by “ Wm. B. Preston, Ex. of E. H. Preston, dec’d,” or “Wm. B. Preston, Com.” On the second bond is a credit endorsed in these words : “ The within bond is entitled to a credit of $531 92, Aug. 27th, 1852.” *103 This payment was no doubt made by the debtor to Moorman, as the receipt endorsed on that bond is dated two days before the date of said credit, and is for the amount of the bond in full. These bonds remained m the possession of Moorman until his death, and in the possession of Moorman’s administrator until the settlement between him and Peters, when they were delivered to Peters. There cannot be a doubt, I think, but tt at they were considered by all parties concerned, as the still subsisting bonds of Peters, after they were taken up for him by Moorman; and the only effect of the transaction, so far as concerned Peters, was, that thereafter Moorman was to be his bond creditor instead of Preston; in other words, to substitute Moorman in the place of Preston, as the obligee of the bond. ' The same thing, in effect, might have been accomplished by an assignment without recourse by Preston to Moorman The receipt was, of “S. P. R. Moorman,” not of “ Wesley Peters, through S. P. R. Moorman.” The bonds were not given up by Moorman to Peters to be cancelled, but were continued to be held by Moorman as still subsisting bonds. Moor-man took no new note or bond of Peters, or any other evidence of the debt than the old bonds themselves, with the receipts endorsed thereon, showing his title to them. Would he have so acted if he had not regarded the bonds as due to him, after he paid the amount to Preston ? He might, at his own costs, and for his own use, have sued upon the bonds in Preston’s name, indemnifying Preston against the costs of the suit. Wesley Peters, whose deposition was taken by Moorman’s administrator, therein confirms the foregoing view of the transaction between himself and Moorman. He explains the reason which induced Moorman to take up the bonds,-, and which need not be repeated here. In answer to a question propounded to him by the plaintiff’s counsel: *104 “ Did you not consider that the amount you owed him on account of these bonds, was evidenced by them — and did you not, in fact regard your obligation to pay the bonds as merely transferred from Preston to Moorman— or> *n °tber words, did you .not regard Moorman as an assignee of the bonds?” — he answered: “When I gave ^ " these bonds I expected to pay them; and while Mr. Moorman paid them off for me, of course I felt bound to Mr. Moorman ; and I considered that Mr. Moorman would hold the bonds until I paid them off; then, when I paid them off, I did not expect to hear of them. I did look upon him as holding the bonds against me. As to Mr. Moorman’s being an assignee, I thought nothing about it. I expected Mr. Moorman to pay the bonds and hold them; and whenever I got able I was to pay him.” In answer to another question put to him by the plaintiffs’ counsel,’- he said: “ There were other transactions between us (Moorman and himself) besides the bonds; and there was a running account kept between us. I regarded the indebtedness on account of the bonds as a separate transaction, because there was no entry or any account made of that sort. I considered that he held those bonds against me. I considered that I owed him that amount of money.” In regard to an item of $958 96, charged in his account with Moorman, as having been paid to the latter May 15, 1857, he said: Moorman “ was to credit me with said amount on my land bonds.” C. C. Peters, whose deposition was taken by the plaintiffs, says: “ The statement shown to me is in my hand-writing, and I made it. My recollection is, that Wesley Peters had purchased land of Wm. B. Preston, Commissioner, to sell lands of Elisha H. Preston, dec’d, and had executed his bonds to Preston for the purchase money. When the bonds became due, he, Peters, was not ready to pay them. Samuel P. R. Moor- *105 man paid the bonds to Preston, and held them; and the A $958 96 was to be credited on those bonds. I have no recollection as to the time of payment, but suppose was as stated on the paper, from my certificate.” The statement above referred to is returned with the deposition. Under the item of “1857, May 15, to cash paid you $958 96,” is the certificate of C. C. Peters, in these words: “ I was present on the above date, and the understanding was, that the amount $958 96 was to be entered as a credit to the said Peters’ land bond to Moorman. C. C. Peters.”
I think, therefore, that these bonds were not discharged by the payment of the amounts of them by Moorman to Preston, but enured thereafter to the benefit of Moorman, who thereby became, not a simple contract, but a specialty creditor of Wesley Peters; and whose claim on that account was not barred by the statute of limitations when it was settled with his administrator by Peters, as aforesaid.
After expressing the foregoing opinion, it is hardly necessary to say any thing upon the other'ground above mentioned, that if the statute were applicable to any portion of the debt, it does not appear that the debtor would have availed himself of the defence of the statute if the administrator had not been willing to receive payment of the debt in Confederate currency. If a portion of the debt had been actually barred by the statute, and Wesley Peters had refused to pay it except in Confederate currency, and had threatened to plead the statute if sued for the debt, the administrator would, doubtless, have been warranted in receiving at least that portion of the debt in Confederate currency. But it is not pretended that he ever said one word about any portion of the debt being barred by the statute; much less that he eyer threatened to plead the statute, if sued for the debt; *106 an<2 Mere can be no doubt but that he considered his , . bonds to be m full force, for the security and indemnity of Moorman, for the money paid by him in taking them , , . -i-i-,.r aP; and that he would, it requested, have renewed his bonds to Moorman for the same amount. Not a word is said in the answer of the administrator about any objection by Peters to the payment of any portion of his debt on account of its being barred by the statute of limitations; and no question is asked him on that subject on either of his two examinations.
I am, therefore, of opinion that the Circuit court erred in scaling the amount received by the administrator of Moorman, in discharge of the debt due from "Wesley Peters; and that, instead of doing so, that court should have held him liable for the whole amount received, as if it had been good money.
2d. The next ground of error assigned by the appellants, is, that the administrator, in the settlement of his account with the estate of his testator, was allowed credit for the full amount of the Confederate money paid by him in discharge of certain debts due by the estate, instead of the scaled value of such money; the appellants contending that only such value ought to have been allowed, though the said debts, or most of them, were specie debts.
Clearly there is no error in the decree of the Circuit court in this respect. These payments were made out of Confederate money received by the administrator on account of the estate. If it was improperly received its being applied at par to the payment of debts which might have been demanded in specie, made it as valuable to the estate as if it had been specie ; and thus prevented any less to the estate, from the act of the administrator in receiving such money. If it was properly received, then the money of the estate was applied to the pay *107 raent of the debts of the estate, which of course was right; and the estate was thus benefited by the payment of its specie debts in its own depreciated currency
3d. The last ground of error assigned by the appellante, is, that the Circuit court, by its decree, instead of holding the appellee, Thomas Holland, liable in good money for the price agreed to he given for the land lo ought by him of the administrator, gave him an election to take the land on those terms, or to rescind the sale, and receive out of the pi’oceeds of a re-sale of the land the value of the Confederate money paid by him for the land.
It will follow, from what I am about to say in regard to the error assigned in the brief of the counsel of the appellee, Holland, that I am of opinion that the appellants’ third and last ground of error is not well founded. I, therefore, proceed to consider:
4thly. The ground of error assigned by the appellee, Holland. That error is, that the Circuit court, instead of making the decree which it did, in regard to his purchase of the land,'ought to have decreed that the administrator, Johnson, should execute and deliver to him a deed with special warranty, conveying to him in fee simple the tract of land aforesaid.
The testator by his will, after making provision out of his estate for his wife — having first charged it with the payment of his debts — directed .that the remaining part of his estate, except the negroes, should be converted into money; which, with the remaining negroes, after his wife’s selection, should be divided into three equal parts; one part to be placed in the hands of Achilles H. Moorman, as trustee for the benefit of his daughter, Sarah J. Richey, and her children; and the other two charts to he placed in said Moorman’s hands, as guardian *108 *'or'daughter Mary James Moorman, and his son Charles Pleasant Moorman. The will is dated Hovem3d, 1852. The testator died in October or November 1861, and his will was admitted to probate November 25th, 1861; and his administrator qualified December 3d, 1861. The inventory and appraisement of the estate, real and personal, was made on the 27th of December, 1861; and on the same day the slaves were divided according to the will, by the same persons who appraised the estate, and who had also been appointed-commissioners to make the said division. On the same day, also, the perishable estate was sold by the administrator. The land afterwards sold to Holland was appraised at $8 per acre. The appraisement was ordered to be made in current money, and was made accordingly: current money at that time being State bank notes and Confederate States treasury notes. The administrator was present at the appraisement; and then took Wesley Peters aside and told him if he would sell the land in question at $8 per acre, the appraisement price, to do so; that he, the administrator Johnson, was confined in Richmond (being a member of the State Senate) and could not attend to it, and would be glad for Peters to assist him in selling it. Very soon thereafter a negotia-' tion was commenced by Holland, by letter, with Johnson, and afterwards carried on in person with Peters, until the 26th of February 1862, just two months after the appraisement, when a sale was effected by Peters for Johnson to Holland, with the knowledge and approval of the testator’s widow, and with the sanction of Johnson, at ten dollars per acre for 280 acres, being the larger portion of the said land. One thousand dollars of the purchase money, was paid in hand, in current money, and the balance was to be paid, one-half on the first of January 1863, and the other'half on the first of January *109 1964. For the cash payment, a receipt was given on the same 26th of February, 1862, by Johnson, as administrator. Shortly thereafter, the residue of said tract of land, 84-j- acres, was sold to said Holland at $8 per acre; and on the 24th of November 1862 the residue of the purchase money of the whole tract $2,159, was paid by the purchaser to the administrator, who thereupon executed a receipt in full for the purchase money of both portions of the said tract ; the deferred instalments of the first portion being thus paid in advance. The quantity of that portion turned out to be 248J acres, instead of 280 acres, as mentioned in the first receipt; which reduced the amount afterwards paid to that extent. No conveyance was executed by the administrator to Holland, during the war; no doubt because the parties were seldom if ever together; Johnson being generally in Eichmond, attending to his duties in the Senate, and Holland probably at his residence on the said land, which was situated in a part of the county remote from the court-house, or perhaps in the military service of the country. At all events, there can be no doubt but that the administrator would, at any time when requested by Holland, have executed a conveyance of the land to him; and Holland knowing that fact, and having possession of the two receipts aforesaid, which showed that he was entitled to a deed, therefore delayed making a request for one until after the war. Now the question is, whether he is entitled to demand a deed for the land, or whether he can be subjected, either to the terms which the appellants insist should be imposed upon him, or to the terms imposed upon him by the decree of the Circuit court? If he had gotten his deed, as'Brosius, the purchaser of the lot in Liberty did, during the war, his title would have been held to be good, as the title of Brosius was, by the Circuit court. Can the mere accident of his *110 not getting Ms deed during the war, to which he was clearly entitled, and which he could easily have gotten, the important effect of preventing him from now getting it?
The power of the administrator to make the sale was exPress and unquestionable. He and his agent Peters, and the purchaser Holland, all acted in perfectly good faith. The property could only be sold at the time for current money, which consisted of State bank notes and Confederate .notes. The currency was at that time but little depreciated in value; and it was not generally expected, if at all, that there would thereafter be any greater depreciation. All, or nearly all, were hopeful that the war would soon end, and we would then have a better and a stable currency. There was no impropriety in making a sale of the land, under the circumstances. It was made as soon as it well could be made, after the qualification .of the administrator. That it was a private, instead of a public sale, makes no difference. The law does not require such a sale to be a public and not a private sale — the will being silent as to the manner of the sale. It ought to be made in such manner as may be most to the advantage of the parties concerned; and we all know that a better sale can sometimes be effected privately than publicly. The sale was made at a fair price, under all the circumstances, regarding it as a sale for current money. The land, just before the Bale, was appraised at eight dollars per acre, by three gentlemen who were appointed by the county court for the important duties of appraising the estate and dividing the slaves, and who performed those duties under oath. The presumption is, they were very fit to perform them, and their fitness is not questioned. They were all well acquainted with the land, and owned land in the same neighborhood. They appraised the land at eight dollars per *111 acre, though at least one of them, was for fixing it at a lower price. The administrator, an eminent lawyer, residing in the county, and perhaps well acquainted with ., , , t + the land, concurred with the appraisers m thinking that eight dollars was a fair price, and requested one of them to aid him in effecting a sale at that price. In sixty days a sale was effected of most of it at ten, instead of eight dollars per acre; and shortly thereafter the balance was sold at eight dollars, the appraisement price. This evidence of the value of the land at that time is much more reliable than the evidence of its value introduced on the other side. The evidence of witnesses as to the value of land during the war, given after the war was over, and post litem moiam, cannot be much relied on, even though the witnesses be persons of good character for veracity; as is no doubt the case here. But, if we suppose that in fact the land, at the time of the sale, was intrinsically worth more than was gotten for it, yet if the sale was fairly and bona fide made, and especially if it was as good a one as could be made at the time and under the circumstances, it is unquestionably valid. Although Confederate money was depreciated to some extent at the date of the sale, yet the depreciation was not large, and there was not much difference between the price of land then and before the war. Confederate money was, generally, current at par in payment of specie debts, and was worth more than its gold value for the purposes for which money is ordinarily used. If the whole amount of the purchase money had been paid in hand, instead of one thousand dollars only, on the 24th of February 1862,. I presume there could have been no doubt of the propriety of the' transaction. But the balance was not paid until the 24th of November 1862, when there was still greater depreciation of the currency. "Was it proper in .the purchaser, then to pay, and the *112 administrator then to receive, that balance in the then depreciated currency, at par ? That payment and receipt were long in anticipation of the maturity of the deferred instalments of the purchase money; and if they could kave been lawfully discharged at maturity in Confederate money, at par, it was certainly a very beneficial arrangement for the estate that payment in full should be made and received on the 24th of November 1862. Without enquiring whether the deferred instalments could have been thus lawfully discharged at maturity, I think it was perfectly competent for the parties to settle the matter as they did on the 24th of November 1862. The purchaser then paid the full balance of the purchase money, as claimed by the vendr, and received from him an acquittance therefor; which he had full power to give. In this transaction both parties acted in good faith. It is not pretended that they did not. And uj)on the payment of the balance and the execution of the receipt in full by the administrator, Holland became entitled to demand the execution and delivery of a conveyance to him of the legal title. The administrator was thenceforward seized of the naked legal title, as trustee for Holland, and could not withhold it from him. NO' terms could be imposed upon him by a court of equity a condition for decreeing him the legal title, whenever he chose to demand it. The administrator had no equity against him. He had fully performed his part of contract, and nothing was left to be enforced against him, either at law or in equity. It is only when a party in default, that equity can impose terms upon him. Hale v. Wilkinson, 21 Gratt. 75, 90 and 91. The purchaser could successfully defend himself in an action at against him by the administrator, without a convey-of the legal title. Code, ch. 135, § 20.
I am, therefore, of opinion, that the Circuit court *113 erred in its decree in regard to the purchase of land made by the appellee Holland, of the appellee Johnson, administrator as aforesaid; that the said purchase was :i valid and legal one; that the terms of it were fully performed on the part of said Holland, who is theref : e entitled to have the land conveyed to him by the s id administrator ; that the said administrator ought to be charged in the settlement of his account with the amount of the purchase money of the said land, at the scaled value of so much Confederate currency at the time it was received; and that the said land should be decreed to be conveyed to the said Holland, in fee simple, by deed, with special warranty.
I am, therefore, for reversing so much of the said decree as is in conflict with the foregoing opinion, and affirming the residue thereof; and remanding the cause for further proceedings, in conformity with the said opinion.
Christian and Staples, Js., concurred in the opinion of Moncure, P.