## Wytheville.

### Rhea et als. v. Preston.

#### July 21.

#### Absent, Moncure, P.

1. K sold and conveyed to T a tract of land, reserving a lien for the payment of the purchase money. Afterwards, and on same day, T executed two deeds of trust to secure the payment of two certain debts to D, in one of which deeds the tract purchased from K is conveyed to secure one debt, *K uniting in this deed,* and in the other deed a tract called the "Mill tract," to secure the other debt. Subsequently to these deeds T executed another trust deed to secure a debt to P, conveying the said "Mill Tract" and other tracts of land. Held: That K had the right to require that the debt to D shall be paid by the "Mill tract" on which D, as between himself and K, has the exclusive lien, and leave the other tract to be applied to K's lien; and K's equity in this respect is prior and paramount to that of P to have the "Mill tract" on which his lien rested exonerated from the D debt for his benefit.

2. Judgments for money, whether docketed or not, bind the unaliened lands of the debtor; certainly those owned by him at the date of the judgments, and, it may be, those subsequently acquired, in the order in which the judgments are recovered, and the same is true of decrees for money; and so, though not docketed, they bind the debtor's lands subsequently aliened to a purchaser with notice, even though he be a purchaser for value; but unless docketed they are not liens on lands subsequently aliened to *bona fide* purchasers for value without notice—and a trustee in a deed of trust given to secure a debt, and the creditor secured, are purchasers for value within the meaning of the registration laws. Code of 1860, Ch. 186, §§ 6, 8, 11; Code of 1873, Ch. 182, §§ 1, 6, 8, 11.

3. A sheriff may purchase a debt in his hands for collection by execution, if he act *bona fide.* The creditor holds the title, and he may transfer it to whom he will, and it makes no difference that the advance is made at the instance of the debtor, provided there is no intention to extinguish the debt, and the judgment is assigned as a continuing security.

4. The mere levy of an execution is not a satisfaction. There must be a sale or some other act divesting the debtor of his title or depriving him of his property. And where the property levied on is left with the debtor and the levy abandoned, other creditors may resort to it, if they see fit, in like manner as if no execution had issued.

5. A forfeited forthcoming bond stands as a security for the debt, and though while in force no execution can be taken out or other proceeding be had at law to enforce the original judgment, yet the bond is not an absolute satisfaction. For if it be faulty on its face, or the security when taken be insufficient, or the obligors, though solvent when the bond is taken, become insolvent afterwards, the plaintiff may, for these or other good reasons, on his motion, have the bond quashed and be restored to his original judgment. And though the bond be not quashed, if it appear that it may properly be, a court of equity, which looks to substance rather than form, and when occasion requires it treats that as done which ought to be done, will regard the bond as a nullity, and the original judgment as in full force.

6. Where the accommodation indorser or surety of a note, on which judgment has been obtained, purchases real estate from the principal debtor who retains a lien for the purchase money, and it is a matter of contract between them, at the time of the sale, that the indorser or surety shall assume the payment of the judgment, the relation of the parties *inter se* is changed. The indorser or surety becomes the real debtor, and the principal debtor the surety; and the latter has the right to require that the lien of the judgment shall be enforced for his exoneration against the real debtor.

This was a suit in equity in the circuit court of Smyth county (afterwards removed to the circuit court of Wythe county), brought by James W. Preston, who sued in his own right and as surviving administrator of John M. Preston against Abijah Thomas and others, asking for a sale of the real estate of said Thomas to satisfy sundry deeds of trust thereon, executed by said Thomas, and judgments which had been obtained against him.

On the 24th day of November, 1860, the said Abijah Thomas executed his writing obligatory to the said John M. Preston for the sum of $5,693, payable twelve months after date, with interest from date. And on this same day

the said Abijah Thomas and Priscilla his wife executed to
A. C. Cummings, trustee, a deed of trust conveying six adja-
cent tracts of land in Smyth county, and a separate tract
of 354 acres, called the "Mill Tract," to secure the payment
of the said sum of money. The said John M. Preston after-
wards departed this life intestate, and upon the distribu-
tion of his personal estate the said James W. Preston be-
came entitled to the said writing obligatory, and the same
was transferred and assigned to him by the administrators
of said John M. Preston.

Prior to the execution of the deed of trust to said A. C.
Cummings—to-wit: on the 2d day of June, 1859—the said
Thomas and wife had executed to Benjamin R. Floyd, trus-
tee, to secure to George Douglas two several debts of $6,000,
two deeds of trusts, conveying by one of said deeds a tract
of 414 acres of land in Smyth county, referred to in the pro-
ceedings as the "Killinger tract," in which deed one Peter
Killinger (who had sold the land to said Thomas, retaining
a lien for the purchase money), united; and by the other of
said deeds conveying the said "Mill Tract," embraced in
the trust deed to said A. C. Cummings. The said Thomas
had also on the 29th day of July, 1858, executed to James
H. Gilmore a deed of trust to secure V. S. Morgan a debt of
$8,000, conveying a tract of 400 acres, another portion of the
land embraced in the trust deed to said A. C. Cummings,
trustee.

Subsequently to the execution of the said deed to the
said A. C. Cummings, trustee, the said Thomas and wife
executed a trust deed to E. A. Scott, trustee—to-wit: on the
17th day of December, 1860—to secure to W. P. Scott a debt
of $12,500, conveying all the lands which had been con-
veyed to said A. C. Cummings, trustee, as aforesaid, except
the "Mill Tract."

The complainant's bill, after reciting the above facts
(which are proved by the exhibits filed), states that the

complainant is informed that if not all, at least a large part of the debt secured by the deed of trust executed as aforesaid to said Floyd as trustee, had been satisfied and paid, and that the complainant claimed that said Douglas, the beneficiary in said deed, shall look first for any balance due him to the deed on the 414 acres of land (the "Killinger tract") before he is allowed to resort to the "Mill Tract," he having two subjects to look to, while the complainant has but the one, unincumbered—to-wit: the mill property.

No judgments against the said Thomas, then unsatisfied, were rendered and docketed prior to the admission to record of said Douglas's deed of trust; but there were rendered and docketed prior to the admission to record of any of the other deeds of trust before mentioned a number of judgments against the said Thomas, which are particularly set forth in the bill, and which are stated to be all the judgments against him unsatisfied that were docketed anterior to the admission to record of the several deeds of trust to secure said V. S. Morgan, John M. Preston, and W. P. Scott, respectively.

The bill further alleges that the said Abijah Thomas owns many other and valuable tracts of land besides the lands conveyed in trust to secure the debts to the several parties aforesaid, so that although, except as to the deed of trust to secure the said George Douglas, there are prior judgments unsatisfied; yet, under the 10th section of chapter 186 of the Code of Virginia (1860) the lands thus retained by said Thomas are "first liable to the satisfaction of the said judgments" before they can be enforced against any of the lands conveyed by the said several trust deeds. That upon many of the judgments above referred to executions have been issued with returns upon the same showing a levy upon personal property without showing that any disposition of the property has ever been made; upon others

it appears that there have been levies and the property not sold; upon others executions appear, after levy, to have been held up by order of the plaintiff; and upon some of the judgments it appears that executions were ordered to lie for different periods.

The complainant claims that after levy of the said executions, unless the property was released from the levy by legal process, the plaintiffs, as against the deeds of trust aforesaid, cannot abandon their levies and assert the lien of their judgments against the lands conveyed by said deeds.

It is further represented in the complainant's bill that there are numerous judgment creditors of the said Abijah Thomas whose judgments were obtained subsequently to the admission of the deeds of trust aforesaid to record, but their number, the state of their claims, whether satisfied in whole or in part, or wholly unsatisfied, cannot be ascertained without the taking of an account by a commissioner under the direction of the court.

The bill, after making the trustees and beneficiaries in the deed of trust aforesaid, and the judgment creditors of said Thomas, parties defendants, and requiring them to state whether they have received any payments on account of the said encumbrances, and, if any, their several amounts and dates, prays as follows: "That an account be taken of the said debts of the said Douglas and of the payments thereof, and if any balance should appear to be due him, that for such balance he be thrown upon the 414 acres of land (the "Killinger Tract") for satisfaction; that an account be taken of the amounts of the said several prior judgments, and that they may be thrown upon the lands of the said A. Thomas retained by him after conveying the lands aforesaid by said deeds of trust, and be satisfied out of the lands so retained, or that those lands be exhausted before they be held to charge the lands so conveyed; that

it be referred to a commissioner to ascertain and report to court the lands so retained by said Thomas as aforesaid; that an account of the debts due to the said trust deed creditors, including your orator, be taken, and that their priority and equities be so adjusted that they may, if practicable, be satisfied; that the "Mill Tract," being relieved from the Douglas lien, and of the liens of the said prior judgments, and not being embraced in either the deed of trust to secure said Morgan or said W. P. Scott, or so much of said "Mill Tract" as may be necessary for the purpose, be sold to satisfy your orator's said debt; should the said "Mill Tract" not prove sufficient to pay your orator's debt, then for the purpose of paying the balance due your orator, that such other portion of the land conveyed to secure his debt as will best accord with equity and subserve the interest of all parties, be sold; that as sales for cash under said deeds of trust would likely prove disadvantageous and result in a sacrifice of the property so sold, the terms of the said several deeds may be so far changed as that any sales made as aforesaid be upon such time as to the court may seem reasonable and be likely to prove most productive; that, should it appear to the court necessary or proper and equitable, an inquiry be made by a commissioner of the number and of any prior encumbrances of the real estate of said A. Thomas, and that they be allowed to come into this cause under a general order of the court, prove the validity of their liens and the amounts due on them, and have satisfaction thereof out of any surplus of the estate of said A. Thomas, not exhausted by the encumbrances of the parties aforesaid to this suit, or, if necessary, that said junior encumbrances, when ascertained, be made actual parties to this suit;" and for general relief.

On the 2d day of September, 1871, a decree was entered in the cause, referring the same to one of the commissioners of the court, to take an account of all liens on the

real estate of the said Thomas, the order of their priority, and the real estate he possessed, &c.

On the 15th day of June, 1860, Peter Killinger conveyed to George W. Henderlite, as trustee, whatever amount of purchase money was due to him from said Abijah Thomas for the tract of land sold him (the "Killinger tract"), and thus the trustee was invested with all the rights of said Killinger for the purposes of the trust. In December, 1860, Henderlite, as trustee, filed a bill in the circuit court of Smyth county to enforce the vendor's lien for the purchase money; and in August, 1867, the court directed an account to ascertain the amount of purchase money due from Thomas to Killinger.

As both the suits, of Henderlite, trustee, against said Thomas, and James W. Preston against said Thomas and others, were brought to subject to sale the real estate of said Thomas for the payment of his debts, the two causes were heard together, and a number of joint decrees entered; but the causes were never consolidated.

J. B. Rhea and R. J. Preston, as trustees for their wives and children, devisees under the will James W. Sheffey, deceased (of a certain tract of land conveyed by said Abijah Thomas to said Sheffey), and said George W. Henderlite, trustee as aforesaid, presented a petition for appeal from decrees entered conjointly in said causes, which was allowed by one of the judges of this court.

As is stated by *Burks*, J., in his opinion, the record in this cause is " incomplete, confused, and very unsatisfactory." The facts of the cause, so far as they have not been stated, the proceedings had, and decrees appealed from are sufficiently stated in his opinion to understand the points decided

*J. H. Gilmore* and *John P. Sheffey*, for appellants.

*R. A. Richardson, A. C. Cummings, White* and *Buchanan, J. A. Buchan* and *Johnston* and *Trigg*, for appellees.

BURKS, J. The record shows that the encumbrances by judgments, deeds of trust, and vendor's liens on the real estate of Abijah Thomas exceed two hundred thousand dollars, while the value of the estate, including at a reasonable estimate aliened lands liable but not yet sold, is not more, perhaps, than one-third of that sum. Hence this controversy among the encumbrancers and alienees—the former struggling each to secure priority for himself and to exclude others, and the latter endeavoring by all means supposed to be available to protect themselves against loss in their respective purchases.

I have devoted much time and labor to the examination of this case, and have been much embarrassed in coming to conclusions on some points, not only because the case in its nature and of necessity is more or less complicated, but also because of the incomplete, confused, and very unsatisfactory state of the record as it has come into our hands.

The questions arising on the numerous assignments of error, as well by the appellee James W. Preston, as by the appellants, will be disposed of without regard to the order in which they have been presented by counsel.

The deeds of trust to secure the debt to George Douglass constitute the first encumbrance. Its priority, if it has not been discharged, is not disputed; but it is insisted that it was discharged by the stock transferred by Thomas, which was never returned by Douglass, but converted by him, or his administrator, into other stocks, and by the dividends received by Douglass on the stock thus transferred, and that if the account between Douglass and Thomas was properly stated and settled, it would be found that nothing is due from Thomas on this debt. So far as these objections go, first made in the court below and now repeated here, they may be laid out of this case. The amount decreed by the circuit court to the administrator of Douglass was the balance ascertained by the commissioner and shown by the

account filed with his report.   That account is no part of
the record before us.  It has never been brought here, either
by the appellants or appellees, and the evidence or the most
of it on which it may be inferred from the report of the
commissioner the account was based, is also omitted from
the record.   It may be supposed that in the account Doug-
lass was charged with the stock and also with the dividends
received, as the decree directs that "his estate shall retain,
as its own property, the shares of bank stock now held by
the administrator of said Douglass in the Parkersburg Na-
tional Bank, together with any unpaid dividends due by
the Northwestern Bank."   But there is absolutely nothing
in the record, as we have it, to show precisely how the
commissioner stated the account, or upon what evidence it
was based.   Of course, under these circumstances, the ob-
jections to the decree, so far as it is founded on the account
of this debt stated by the commissioner, must be disre-
garded.   Judgments and decrees of courts of competent
jurisdiction are always presumed to be right until they are
shown to be wrong.

It is further insisted that this debt is discharged because
it was paid during the war by Thomas to a receiver of the
Confederate States under the sequestration acts, Douglass
being a resident citizen of the State of New York.   The same
objection is made to the judgments of Aultman & Co. and
John B. Watson, alleged to have been discharged in the same
way.   Whatever may have been or may now be the views
of this court on the merits of the question as an original
one, the propositions affirmed by the late decision of the
supreme court of the United States in *Williams* v. *Bruffy*, 96
U. S. Rep. 176, S. C. 102, U. S. Rep. 248, will no doubt prevail.
In that case the supreme court, on writ of error, reversing the
action of this court, held that the payment to the receiver
under the acts of the Confederate States was not a discharge
of the debt.

The debt to Douglass consisted of the loans of equal amounts made by him to Thomas—the first in the year 1858 and the last in 1859. The first was secured by a deed of trust on what is known in the proceedings as the "Killinger tract" of land, purchased by Thomas of Peter Killinger, who retained a lien for the purchase money. Killinger united with Thomas in that deed. The second loan was secured by a deed of trust from Thomas alone of the same date with the first, conveying another tract of land called the "Mill tract," which was also afterwards with other lands conveyed by Thomas in the deed of trust to secure John M. Preston. The circuit court decreed that for the balance ascertained to be due Douglass, his administrator should be satisfied out of the "Mill tract" (if sufficient for the purpose), and that the "Killinger tract" should be sold to satisfy the lien thereon for the purchase money owing by Thomas to Killinger or his trustee.

The appellee James W. Preston complains of this portion of the decree as erroneous, and insists that Killinger, by uniting in the deed to secure Douglass, released his lien on the land conveyed, and that the balance due Douglass' administrator should be paid by the Killinger tract, so as to leave the Mill tract to be applied to the payment of the debt under the subsequent deed of trust given to secure John M. Preston, under whom the said appellee claims.

But the portion of the decree complained of seems to be plainly right. Killinger never released his lien and never intended to release it. He only designed to postpone it to that of Douglass, and that was the effect and the only effect of his uniting with Thomas in the deed. The case then stood thus: Douglass had a lien on two tracts of land, and Killinger a posterior lien on only one of them, and Preston a still later lien on the other. The parties were all before the court, and the subject of the encumbrances fully under its control. Upon the most familiar principles, Killinger

or his trustee had the right to require that the Douglass debt, or the balance due, should be paid by the tract on which Douglass, as between himself and Killinger, had the exclusive lien, and which, as admitted, was more than sufficient for the purpose, and leave the other tract to be applied to Killinger's lien; and Killinger's equity in this respect was prior and paramount to that of Preston to have the mill property on which his lien rested exonerated from the Douglass debt for his benefit.

The debts secured by the several deeds of trust to Morgan, Preston and Scott are not disputed, nor the validity of the deeds assailed for fraud or other illegality, but a large number of judgments against Thomas were recovered before these deeds were admitted to record, and the claim of a prior lien by some of the judgment creditors is resisted by the trust-deed creditors on several grounds.

The Morgan deed was executed July 29, 1858, and admitted to record July 2, 1860; the Preston deed was executed November 24, 1860, and admitted to record December 17, 1860, and the Scott deed was executed December 17, 1860, and admitted to record January 31, 1861.

The three judgments numbered in the commissioner's report—19, 20, 21—were rendered at the same term of the court in April, 1860, and not docketed until August, 1863. The Code of 1860, ch. 186, § 8, governs as to the docketing, and the statutes saving rights and remedies during the war do not apply, as more than twelve months from the date of the judgments had elapsed before the period at which the statutes commenced to operate. Upon exceptions filed, the circuit court held, that these judgments should be preferred to Preston's deed, but postponed as to the other two deeds. If the right of priority depended alone on the question of docketing and notice, this decision, as to the Preston and Scott deeds at least, must be regarded as plainly right. Judgments for money, whether docketed or not, bind the

Rhea et als. v. Preston.

unaliened lands of the debtor, certainly those owned by him at the date of the judgments, and, it may be, those subsequently acquired, in the order in which the judgments are recovered, and the same is true of decrees for money; and so, though not docketed, they bind the debtor's lands subsequently aliened to a purchaser with notice, even though he be a purchaser for value; but unless docketed, they are not liens on lands subsequently aliened to *bona fide* purchasers for value without notice—and a trustee in a deed of trust given to secure a debt and the creditor secured are purchasers for value within the meaning of our registion laws. Code of 1860, ch. 186, §§ 6, 8, 11; Code of 1873, ch. 182, §§ 1, 6, 8, 11; *Hill and others* v. *Rixey and others,* 26 Gratt. 72; *Borst* v. *Nalle and others,* 28 Gratt. 423, 428, *et seq.; Williams and others* v. *Lord & ·Robinson,* 5 Va. Law Journal, 243, 250; S. C., *ante* p. 390, and cases there cited.

There is no pretence that Scott or his trustee had notice, but it is proved that John M. Preston, under whom the appellee James W. Preston claims, at the time he took his deed of trust, had actual knowledge of the judgments in question; for he was then the owner of them, having purchased and taken an assignment of them more than two months before the deed of trust was given.

If the land encumbered by Morgan's deed were the only land owned by Thomas at the time the deed went to record, it might be a question presenting difficulty, whether the deed or the judgments were entitled to priority—the deed being declared by the statute void as to creditors (whether with or without notice) "·until and except from the time that it is duly admitted to record," &c., and the undocketed judgments *not* a lien on real estate as against purchasers thereof for valuable consideration without notice. The question, in its general bearing, is of great importance and was but little argued. I give no opinion upon it, as it is not necessary to do so in the present case; for, if it be con-

Rhea et als. v. Preston.

ceded that the lien of the judgments is superior, still they were properly postponed to the deed, under the circumstances. It is perfectly apparent that the real estate owned by Thomas at the time the judgments were recovered, and also when the deed went to record, was largely more than sufficient to satisfy all the encumbrances then upon it. These three judgments bound the whole, and taking them to be paramount to the deed of trust, yet Morgan had the right to require that they should be enforced against the other lands to the exoneration of the tract embraced in his deed. Code of 1860, ch. 186, § 10; Code of 1873, ch. 182, § 10. This right existed at the date of the decree as to the unaliened lands and also all other lands as against the purchasers thereof with notice. Preston was of the latter class, and therefore, in the view taken, the judgments, so far as the question of priority depends on the registration either of the deed or the judgments, should be preferred to his deed and postponed to Morgan's as well as Scott's.

But the priority of these judgments is resisted on another ground; and the objection, which is urged not only on behalf of the creditors claiming under the Preston and Scott deeds, but also on behalf of the subsequent alienees of Thomas, applies equally to a large number of other judgments sought to be enforced.

Upon these contested judgments executions were issued in 1860 and placed in the hands of Morgan as sheriff. It seems that Thomas at that time was the owner of a number of valuable slaves and other personal property, and most of the executions were levied on property sufficient, as it is claimed, to satisfy them, while a few of them were not levied at all. No sales, so far as the record shows, were made under the levies, and it would seem that the property, after levy in each case, was left in the possession of Thomas (the debtor), and the executions were never further nor otherwise carried into effect. In other words, the levies

were abandoned. The returns show the levies where any were made. In a few cases they state that the executions were held up by request of the plaintiffs, but in most cases they show the levy merely, and no account is given of the disposition of the property. A considerable number Morgan, while sheriff, satisfied out of his own means, or, rather, advanced the money on them to the plaintiffs, took assignments to himself, and claims them as his own property. Several he thus acquired after he ceased to be sheriff. The assignments are endorsed on the executions. Under these circumstances the trust-deed creditors and the subsequent alienees contend that Morgan, as sheriff, by his official default or misconduct, rendered himself personally liable for these judgments to the creditors, and that neither he as assignee, nor they in their own right, should be allowed in equity to enforce the judgments to the prejudice of the encumbrances of the trust deed and the alienees; that so far as Morgan has taken assignments, the judgments should be treated as satisfied, and in other cases that the judgment creditors should be required to look to him for the payment before resorting to the lands of Thomas—if, indeed, they could be allowed to resort to the lands at all as against the creditors under the trust deeds and the alienees.

In substance, the claim is that there was personal property sufficient to satisfy the judgments, and if the execution creditors and the sheriff had done their duty the judgments would have been all paid out of the personal property and the real estate of the debtor left for the other creditors; and that by releasing or abandoning the levies and thus failing to get satisfaction therefrom, they are precluded from resorting to the real estate to the injury of others.

There is certainly great plausibility in this argument, but I do not think it should prevail.

As to the three largest judgments (Nos. 19, 20, 21), it is

distinctly proved that the executions upon them were not enforced ultimately, but were returned by the direction of John M. Preston, who owned them ; and certainly his son, James W. Preston, who now claims under him as beneficiary in the deed of trust, and who is the party that complains most, is the least entitled to be heard. Laying Morgan's testimony as to the returns out of the case, the testimony of Cecil and other witnesses is sufficient to show that the levy of these executions was never intended by John M. Preston to be enforced. The very object he had in view in purchasing the judgments, as is shown, was to prevent the sale of the property which had been levied on.

I do not regard the mere circumstance, that Morgan was sheriff when he acquired several of the judgments he is seeking to enforce, as sufficient to affect his title injuriously. A sheriff may purchase a debt in his hands for collection by execution, if he act *bona fide. Clevinger* v. *Miller,* 27 Gratt. 740. True, if he make default in his office and thereby incur a liability which he discharges under legal compulsion, he is not entitled to indemnity by subrogation, at least as against third parties who would be injured by it. *Clevinger* v. *Miller, supra ; Shearman's Adm'r* v. *Shaver, ante.* p. 1. But this is not a case in which the doctrine of subrogation, which is a mere equity, applies. It is a case of express contract, in which the sheriff advances the money on the judgment and takes an assignment. It does not alter the matter, that he has made himself liable to the creditor. The creditor holds the title and he may transfer it to whom he will. Nor does it make any difference that the advance is made at the instance of the debtor, provided there is no intention to extinguish the debt and the judgment is assigned as a continuing security. *Moss and Wife and others* v. *Moorman's Adm'r and others,* 24 Gratt. 97, 103.

As to the assigned judgments, therefore, the sheriff took the rights of the assignors, and is on the same footing, I

think, with the other judgment creditors; and as to all of them, it is difficult to perceive on what legal principle they can be barred or postponed in the enforcement of their liens against the debtor's real estate. The judgments were never satisfied. A mere levy of an execution is not a satisfaction. There must be a sale or some other act divesting the debtor of his title or depriving him of his property. *Walker and others* v. *Commonwealth*, 18 Gratt. 13. The property was left with the debtor. Other creditors might have resorted to it, if they saw fit, in like manner as if no executions had issued. If the executions had been sued out and employed as a means to hinder, delay, and defeat other creditors, the case would be different; that would have been a fraud. But there is no such charge in the bills or other pleadings, and nothing in the evidence on which such an imputation can be justly founded. Nor is there the least foundation for the assumption that either Preston or Scott, in giving credit to Thomas and taking deeds of trust on his lands as security, was influenced in the slightest degree by the circumstance that executions had been sued out by other creditors and levied on his personal property sufficient to satisfy them. The contrary is to be inferred, certainly as to Preston, who knew of the liens, and as to his own executions directed their return without satisfaction; and no answer was filed by the administrator of Scott, who is dead.

No ground of estoppel is set up in the pleadings, and none established by the evidence, in favor of the trust-deed creditors or the alienees. They may have misjudged, but it does not appear that they were misled by any of the judgment creditors or of the sheriff. I am of opinion, therefore, that the circuit court did not err in not postponing the judgment creditors on the grounds which have been considered.

There are some special objections to particular judgments, which will now be noticed.

Judgment No. 21, it is alleged, is the debt of Peter Killinger with Thomas as accommodation endorser or surety, and should have been enforced against the fund to which Killinger is entitled under the vendor's lien. There seems to be no doubt that this was the debt of Killinger when contracted. But the proof is clear, that when he sold his land to Thomas, retaining a lien for the purchase money, it was one of the terms of the contract that Thomas assumed the payment of this debt in part discharge of the purchase money for the land. This is expressed in the agreement. By this arrangement, the relation of the parties *inter se* was changed. Thomas became the debtor and Killinger surety, and according to the settled course of equity practice in such cases, Killinger had the right to require that the lien of the judgment should be enforced for his exoneration against the real debtor. *Buchanan* v. *Clark and others*, 10 Gratt. 164 ; *Shultz and others* v. *Hansbrough and others*, 33 Gratt. 567. This judgment, therefore, was properly credited on Killinger's debt against Thomas and enforced by the decree as Thomas' own debt.

No. 38 is a judgment of the Northwestern Bank of Virginia jointly against E. A. Scott as maker and Abijah Thomas, W. A. Jones and V. S. Morgan as endorsers, in the order here named, of a negotiable note discounted by the bank for the accommodation, it would seem, of the maker (Scott). It is reported by the commissioner as for the use of E. G. Gibbony, executrix.

It is contended, that this judgment has been extinguished by payment, and cannot, therefore, be enforced.

The proof is, that Morgan (the last endorser) paid the judgment to the holder, and was repaid by the assignee in bankruptcy of Jones (the next endorser). Thus the assignee became entitled to look for payment to Thomas (the first endorser), who, as to Jones, was first liable, and the judgment being joint, on payment by Jones' assignee,

it did not in equity become extinguished as a security, but he, or any one claiming under him, has the right to be substituted to the judgment as against Thomas. *Chrismon's Adm'r* v. *Harman and others*, 29 Gratt. 494, 498.

It seems that an execution issued on this judgment was levied and a forthcoming bond taken, which was forfeited and returned to the office. There was never any judgment or award of execution on this bond. The original judgment was duly docketed, but the forthcoming bond having the force and effect of a judgment under the statute, was not docketed. It is contended, that the bond is a satisfaction of the original judgment, and not having been docketed, should be postponed to the deeds of trust subsequently given. A sufficient answer to the objection is, that it comes too late. It was not made in the court below. A forfeited forthcoming bond stood as a security for the debt, and though, while in force, no execution can be taken out or other proceeding be had at law to enforce the original judgment; yet the bond is, not an absolute satisfaction. For if it be faulty on its face, or the security when taken be insufficient, or the obligors, though solvent when the bond is taken, become insolvent afterwards, the plaintiff may, for these or other good reasons, on his motion, have the bond quashed and be restored to his original judgment. And though the bond be not quashed, if it appear that it may properly be, a court of equity, which looks to substance rather than form, and, when occasion requires, treats that as done which ought to be done, will regard the bond as a nullity and the original judgment in full force. *Garland and others* v. *Lynch*, 1 Rob. Rep. 545; *Jones, &c.* v. *Myrick's Ex'ors*, 8 Gratt. 179, 211, 212. This shows the propriety of requiring an objection, such as is now made here, to be first made in the court below; for, if made there, it might, perhaps, have been shown that the bond ought to be quashed; and, under such circumstances, to allow ob-

Rhea et als. v. Preston.

jection in the appellate court when not made in the court below, would or might take parties by surprise and defeat the ends of justice.

A question is raised, as to whether this judgment belongs to Jones' assignee in bankruptcy or to Mrs. Gibbony as executrix. The record, as we have it, does not furnish us with the means of settling that dispute, if such it be. The judgment is established as a lien and its rank fixed. The question of title between the parties can be settled by the circuit court when the case goes back.

The claim of the appellant Henderlite to certain lands purchased by him at a sale for delinquent taxes was properly rejected by the circuit court. He purchased pending the suit, the very object of which was to subject these with other lands of Thomas to the satisfaction of the numerous liens and encumbrances upon them. He was one of the encumbrancers and a party to the suit. As surviving partner of Henderlite & Thurman, he had a judgment lien which with others bound these lands. They were part of a common fund in course of administration for the payment of all the encumbrances, and a court of equity would not permit one of the parties pending the litigation to acquire title to the subject for a nominal sum and use it to destroy the claim of the rest. 1 Jones on Mortgages, § 680. It was to the interest of all the parties, and it was the right of each and all, to have the delinquent taxes paid out of the fund, and if the attention of the court had been directed to the subject, as it should have been when the sale was made under the decree, the taxes would have been ordered to be paid out of the proceeds. It was in fact agreed between Henderlite and one of the commissioners who made the sale, that the taxes should be thus paid. But the matter was afterwards overlooked by the commissioner and Henderlite proceeded to get his deed from the clerk. But on the very day he obtained his deed the amount he

had expended was tendered to him and he refused to receive it. It would be shocking to the moral sense if a title thus acquired were permitted to be used for the purposes to which it is sought to be applied in this case.

The questions yet to be disposed of (except the one which will be last considered) are raised by the alienees, who were made parties by the supplemental bills.

It was not error to overrule the demurrers to these bills. They, as well as the original bill, were substantially creditors' bills. They were properly filed by Preston, who was directly interested in having the aliened lands subjected to satisfy the judgment liens, and to that extent exonerate the land in the deed of trust under which he claimed. No account was required to show the necessity of a resort to these lands for that purpose. Such necessity was palpable on the face of the record.

Nor was there any error in not substituting Henderlite to Strother's lien on the "Liberty Hotel" property. Strother, the original owner of the property, contracted to sell it to Thomas on a credit, retaining the title as security for the purchase money. Afterwards Thomas sold it to Henderlite at public auction for Confederate currency, which was to be applied to the payment of Strother's claim, and his title was to be so transferred to Henderlite as to preserve and keep alive the vendor's lien. It was possible perhaps thus to preserve the lien, if the contract had been carried out. See *Brockenbrough's Ex'or* v. *Brockenbrough's Adm'r and others*, 31 Gratt. 580, 597, 598, and cases there cited. But it does not appear that Strother was a party to this arrangement, and when applied to he refused to receive Confederate currency for his debt, and the original agreement failed. Henderlite then made it a condition of his purchase that the property should be relieved of the Strother lien, and refused to pay the purchase money unless and until that lien was removed· It was removed by Thomas giving his bonds with sureties

Rhea et als. v. Preston.

to Strother for what was due him, and a conveyance by Strother to Thomas and by the latter to Henderlite, and in neither conveyance was there any reservation of lien or reference made to any agreement for a lien. It seems to be asking too much of a court of equity to keep alive a lien for the benefit of a party who made it a condition of complying with his purchase that the lien should be discharged.

Nor, as I think, did the court err in its decree in regard to the Palmer land. It is not disputed that this land, at the time it was sold and conveyed to Sheffey, was subject to the lien of the unsatisfied docketed judgments against Thomas, and it is not very clear that the tract of 980 acres, sold and conveyed by Sheffey to Thomas, was not absolutely freed from the vendor's lien, and that both tracts should be subjected to the fullest extent. But, under the circumstances, it would seem to be equitable that compensation should be made to the extent of the purchase money for the 980 acres which entered into the price of the Palmer tract. This was provided for in the decree, and it was right that the sum allowed should not carry interest until possession of the land was surrendered—the use of the land by Sheffey and his devisees, while they held it, being deemed equivalent to the interest on the sum allowed.

Complaint is made by Sheffey's devisees that this sum is not allowed to them instead of to his estate, and what seems remarkable, the personal representative of Sheffey unites in the complaint. I do not see how the decree could have been otherwise than it is. It was the land that was devised. The title having failed, the devisees have no recourse on the devisor's estate. The compensation grows out of the contract made by Sheffey in his lifetime, is personal in its nature and must go to his personal representative. If, however, he disclaims title and insists that the devisees should receive the money, the way is open to him

and those he represents, if they are *sui juris*—let them release to the devisees and their wishes will be accomplished. The first sale of 980 acres under decree not having been completed, in ordering a resale it seems to be proper that the allowance to the estate should be charged, as was directed, on that land. This in effect is reinstating the lien just as it stood when Sheffey bought the Palmer tract. There can be no valid objection to this restoration of the parties to the *status in quo,* which is the common course in such cases, whenever it can be done.

The assignment by the appellee, James W. Preston, as error, that the decree of August, 1878, decides that J. S. Copenhaver is entitled to allowance for improvements on certain lots purchased by him, cannot be considered on the present appeal. The appellants do not complain of the decree in that particular, and not deeming Copenhaver interested in the matters of which they do complain, did not have process issued and served upon him, nor has any appearance ever been entered for him. See Code of 1873, ch. 178, § 12. He is, therefore, not before the court, and if the appellees desired that the decree should be reviewed so far as it affected him, they should have prayed an appeal for that purpose and had him duly summoned. They could not accomplish their purpose under the 9th rule of the court (see Rules in 20 Gratt.), in the absence of the party directly interested in the matter to be considered and determined. It is supposed that their counsel could not have attached much importance to this assignment of error, or he would have taken the proper course to present it for consideration. Hence probably it was, that the question arising on the assignment of error was not argued at bar, nor, in fact, so far as I remember, even referred to. In this state of the case, the appellees cannot be heard to allege the error assigned or suggested.

The only error alleged which, in my judgment, requires

Rhea et als. v. Preston.

a reversal to any extent of the decrees complained of, consists in giving the several judgments numbered in Commissioner Bolling's report respectively as 29, 30, 31, 32, 36, priority over the Preston and Scott deeds of trust. These judgments, though severally recovered before, were not docketed until after the execution and recordation of the deeds. The error is apparent on the face of the report. The priority of the deeds was specially stated in Commissioner Baskerville's report, which was recommitted to Commissioner Bolling, who, in his report subsequently made, failed, inadvertently, no doubt, to accord the priority. There is no evidence nor allegation of notice of the judgments to the trustees or the secured creditors at the time the deeds were given. For this error, the decrees, so far as they are affected by it, must be reversed, and in all other respects they will be affirmed. But as the reversal is in favor of the appellees, they, as the parties substantially pervailing, must have their costs here.

CHRISTIAN, ANDERSON, and STAPLES, J's, concurred in the opinion of *Burks*, J.

DECREES REVERSED in part.